1
2
3
4
5
6
7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   ULICES AGUILAR,                     )   Case No.: 1:12-cv-01547-LJO-JLT
                                          )
12              Petitioner,               )   FINDINGS AND RECOMMENDATIONS TO
                                          )   DENY PETITION FOR WRIT OF HABEAS
13        v.                              )   CORPUS (Doc. 1)
                                          )
14   MATTHEW CATE,                        )   ORDER DIRECTING THAT OBJECTIONS BE
                                          )   FILED WITHIN TWENTY-ONE DAYS
15              Respondent.               )
                                          )
16   _____

17        In 2008, Petitioner was convicted of second degree murder and sentenced to an indeterminate

18   term of 40 years-to-life.  In addition, the jury found true special allegations related to a gang

19   enhancement and a firearm enhancement.

20         In this action, Petitioner asserts the Double Jeopardy Clause prohibited the jury's determination

21   of the factual grounds for the enhancements and that there was insufficient evidence to support the gang

22   enhancement.  He claims also that there were errors by the trial court and his counsel in refusing to

23   excuse certain jury members. The Court finds Petitioner has failed to demonstrate his arguments are

24   well-taken and recommends the petition be **DENIED**.

25   **I.       PROCEDURAL HISTORY**

26        After his 2008 his conviction for second degree murder and the jury's determination that the

27   special allegations related to a gang enhancement and a firearm enhancement were true, Petitioner was

28   sentenced to an indeterminate term of 40 years-to-life.  Petitioner appealed the conviction to the

1

1  California Court of Appeals, Fifth Appellate District (the "5th DCA"), but it was affirmed.  (Lodged

2  Document ("LD") 1).   Petitioner's subsequent petition for review filed in the California Supreme

3  Court,  was summarily denied.  (LD 2).  Petitioner then filed a state habeas petition in the Superior

4  Court which was denied.  (LD 4).  Likewise, his habeas petitions in the 5th DCA and the California

5  Supreme Court were summarily denied.  (LD 6; 8).

6  **II.**    **FACTUAL BACKGROUND**

7      The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

8      Appellant was a Surenos gang member.

9      Prior to 2004, Cisneros, Garcia and Marquez were all Norteno gang members or associates.

10     On an unspecified date, Cisneros's car was stolen. Cisneros blamed Marquez for the theft.

11     Cisneros told Garcia that he wanted to shoot Marquez and Garcia agreed to help him. Garcia
       asked Guillermo Maldonado for a gun. Maldonado initially agreed. But two weeks before the
12     murder, Maldonado told Garcia that he could not get them a gun. Garcia did not take any further
       action to assist Cisneros.

13     Cisneros began associating with Surenos gang members and associates, including appellant.

14     Sometime prior to the murder, appellant and Marquez got into a fight.

15     On May 1, Cisneros was with some Surenos when a group of Nortenos confronted them. The
16     two groups prepared to fight. Cisneros pulled out a handgun, aimed it at the ground, and fired it
       repeatedly. The Nortenos left.

17     During the evening of May 5 and early morning hours of May 6, appellant, Cisneros, Eliseo
18     Sanchez and Lorenzo Perez were socializing at appellant's residence.  Appellant had a handgun
       tucked in his waistband; he said that he was going to "cap it." Cisneros and appellant got up to
19     leave. Cisneros said, "[W]e'll be back, we're gonna go to [Marquez's] house." Appellant said, "I
       got your back."  Appellant and Cisneros left the gathering.

20     After retrieving a rifle from Cisneros's house, they walked to Marquez's house.  Appellant
21     stayed outside while Cisneros entered Marquez's bedroom.  Cisneros fired multiple shots from
       the rifle at Marquez, killing him. Cisneros and appellant ran back to appellant's house.

22     Shell casings and a detached bolt handle were left at the crime scene.

23     About a week later, detectives found a rifle in appellant's bedroom. It was subsequently
24     determined to be the murder weapon.

25     Appellant admitted in a police interview that he and Cisneros went to Marquez's house.
26     Cisneros was carrying a rifle. However, appellant denied knowing that Cisneros was going to
       shoot Marquez.  Appellant said that he walked to the back gate and stayed there.  Appellant
       heard gunshots.  They ran back to appellant's house.  Appellant took the rifle from Cisneros and

27

28  _____

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).
Thus, the Court adopts the factual recitations set forth by the 5th DCA.

put it in his bedroom closet.

Deputy Sheriff Joe Aguilar testified as the prosecution's gang expert.  City of Madera Police Officer Jason Dilbeck testified as the defense's gang expert.

Deputy Aguilar testified that the Nortenos and the Surenos are rival gangs who both claim the town of Pixley as their territory. Nortenos use the color red, the number 14 and the letter N as identifying symbols.  Surenos use the color blue, the number 13 and the letter M as identifying symbols. The primary activities of Nortenos and Surenos are burglaries, drug sales, simple assaults and assaults with deadly weapons. The predicate offenses were the conspiracy to commit murder between Garcia and Cisneros and the actual murder which involved Cisneros and appellant.

Deputy Aguilar opined that appellant was a Surenos gang member because he admitted membership, wore blue clothing, had gang tattoos and associated with other Surenos. Appellant's house was a gathering place for Surenos.

Deputy Aguilar further opined that Marquez and Garcia were affiliated with the Nortenos.

Deputy Aguilar stated that Cisneros had been a Nortenos gang member. A few months prior to the homicide, Cisneros changed his gang affiliation and started associating with Surenos gang members and associates.  Deputy Aguilar based this determination on Cisneros's contacts with gang members.  Cisneros's contacts prior to 2004 were all with Nortenos, but his recent contacts were with Surenos.  Deputy Aguilar testified that changing one's gang affiliation is rare but it does occur.  In this case, Marquez's theft of Cisneros's car and Cisneros's anger "that he couldn't do nothing about it" was the catalyst for Cisneros's change of gang affiliation from Norteno to Sureno. Deputy Aguilar testified:

> "By him basically the car theft was a catalyst that-usually when someone switches sides, there has to be some type of disgruntlement. While it is rare, it does occur. And it usually has to do with a wrong that the subject feels that his particular gang has done him and not backed him up, so he feels the need to switch sides to be able to avenge that and also have backup."

Deputy Aguilar testified the killing would benefit the Surenos:

> "Any time that your rival is eliminated, it shows power. Who commits it is really irrelevant as long as one of the southern gang members is with the subject. This enhances the gang's reputation, shows the aggression, and shows what they're willing to do to get rid of their rivals and to claim a turf."

Further, the murder would "enhance a subject's individual reputation and also show how willing they were to put in work for the gang."

Deputy Aguilar found the prior fight between appellant and Marquez significant in forming the opinion that the homicide benefited the Surenos. He explained:

> "All I would need to know is that he's Southern and he's a Northerner. Any time there's a confrontation between two rival gangs, one has to do something about it. To not retaliate in some way on would show a weakness on your part.... [¶] ... [¶] ... It would show the subject that he himself was personally weak and that his gang was weak."

Deputy Aguilar testified that the lapse of time between the fight and the homicide was not significant, as follows:

> "A subject would have to feel that he had enough backup in case something else—there were retaliations. If in the beginning they were too weak to actually do anything about it,

they would wait until they had enough members or that subject had gathered enough of a reputation to be able to have some backup."

Deputy Aguilar also opined that the killing would "promote or further assist criminal activity by other" Surenos. He explained:

"It would also encourage other gang members to commit similar acts. It would also be used as a recruitment tool to show the younger juveniles that they're tough and not to be messed with and if they join they will be protected."

Officer Dilbeck opined there was insufficient evidence indicating that Cisneros switched gang affiliation. Also, he testified that it appeared "as if the motivation [for Marquez's murder] was personal because of the stolen car and the disrespect that went on with that."

(LD 1, pp. 4-7).

# **DISCUSSION**

## I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

## II.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

4

at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

**III.  Review of Petitioner's Claims.**

Petitioner alleges the following as grounds for relief: (1) Petitioner's constitutional protection against Double Jeopardy precluded the prosecution from retrying the firearm and criminal street gang allegations; (2) the trial court erred in finding that Juror no. 9 did not conceal a bias and was able to be fair and impartial; (3) sufficiency of the evidence as to the street gang enhancement; (4) failure to discharge Juror no. 3 as biased; and (5) ineffective assistance of counsel in failing to move to discharge Jurors nos. 3, 4, and 9 for cause.

A.  Double Jeopardy Violation.

Petitioner first contends that the trial court violated the Double Jeopardy Clause by permitting the retrial of the firearm and street gang enhancements.  This contention is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**A. Facts**

Appellant's first jury trial occurred in July 2007. The jury charge included CALCRIM Nos. 1401 and 1402, which directed the jurors to consider and decide the special allegations only if they found the defendant guilty of first or second degree murder.

The jury began deliberating on July 15, 2007.

On the next day, the foreperson sent a note to the judge stating they were unable to reach an agreement.  That afternoon, the judge asked the jurors whether further deliberations would be productive.  A juror replied: "We have one issue that we cannot all come to an agreement upon as far as making a decision on a verdict.  And no one is swaying at any point in time on that one issue. So, therefore, as far as the people go, no one is wanting to change their opinion on that one term. So we can keep going over it and over it, and it's not making any difference.  So it's like a stalemate."  Defense counsel and the prosecutor submitted the matter without comment. The judge ruled the jury was deadlocked and declared a mistrial.

6

Then the judge ascertained from the jurors that they unanimously agreed appellant was not guilty of first degree murder but were split eight to four in favor of a guilty verdict on second degree murder.  A juror explained, "We had a consensus that it wasn't first degree, but it was an issue of second degree as to one term of the stipulations [sic ] as to what determined second degree.  And we couldn't come to an agreement on that particular term of the second degree."

The judge directed the jury to examine CALCRIM No. 640, which provides instruction on completion of the verdict forms when a defendant has been charged with first degree murder and lesser included homicide offenses. CALCRIM No. 640 does not include instruction on completion of the verdict forms for any special allegations that might be attached to the murder charge.  The judge sent the jurors to the jury room "to see if you can straighten it out."

After a recess, the jurors returned to the courtroom.  The judge asked, "Have you reached a verdict on one count?"  The foreperson replied affirmatively.  The jury returned a not guilty verdict on first degree murder as charged in count one and not true findings on the gang special circumstance, gang allegation and firearm allegation.  The judge restated that mistrial had been declared as to second degree murder and discharged the jury.

Prior to the start of the second trial, appellant filed a written motion to dismiss the firearm and gang allegations.  The People filed written opposition.

The court denied the motion after hearing. Citing <u>People v. Allen</u> (1974) 41 Cal.App.3d 821 (<u>Allen</u>) and our decision in <u>People v. Davis</u> (1988) 202 Cal.App.3d 1009 (<u>Davis</u>), the court reasoned that the findings on the special allegations were beyond the scope of the jury's duties. The jury was instructed to consider the special allegations only if it found the defendant guilty. Since the jury found the defendant not guilty of first degree murder and hung on the question of second degree murder, it should not have considered any of the special allegations. Under <u>Allen</u> and <u>Davis</u>, the jury's findings in such a situation are considered to be mere surplusage, equivalent to a lenity recommendation.  The court also pointed out that the jury's not true finding on the firearm enhancement was incomprehensible since it was proved "beyond any shadow of any doubt whatsoever that a principal" (i.e., Cisneros) discharged a firearm, killing Marquez.  The court thought that, perhaps, "the jury just felt that no blank should be left unfilled on the verdict and put stuff in."

**B. The double jeopardy bar and the collateral estoppel rule are distinct legal concepts arising from the double jeopardy clauses of the state and federal Constitutions.**

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed 'in jeopardy' for the 'same offense.'"  The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense. [Citations.]' [Citation.]" (<u>People v. Anderson</u> (2009) 47 Cal.4th 92, 103–104.)  "Double jeopardy precludes re-prosecution for an offense of which a defendant has been acquitted or to which jeopardy has otherwise attached."  (<u>People v. Davis</u> (1995) 10 Cal.4th 463, 514, fn. 10.)

The collateral estoppel rule, which applies to relitigation of factual issues, is derived from the double jeopardy clause in the Fifth Amendment.  (<u>People v. Cooper</u> (2007) 149 Cal.App.4th 500, 518.)  Collateral estoppel is also known as issue preclusion.  (<u>People v. Santamaria</u> (1994) 8 Cal.4th 903, 912, fn. 2.)  It is an equitable concept based on fundamental principles of fairness and is conceptually separate and analytically distinct from double jeopardy, which applies to retrial of offenses. (<u>Id</u>. at p. 912, fn. 3.)   Collateral estoppel may apply in criminal cases independent of double jeopardy. (See, e.g., <u>Chamblin v. Municipal Court</u> (1982) 130 Cal.App.3d 115, 119.)

The rules governing application of the collateral estoppel rule are settled:

"... Collateral estoppel bars relitigation of an issue decided in a previous proceeding in a different cause of action if '(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; and (2) the previous proceeding resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior proceeding.'[Citations.]"   (<u>People v. Davis, supra</u>, 10 Cal.4th at pp. 514–515, fn. 10.)

To determine whether the collateral estoppel rule applies,

"[the court is] to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'[Fn. omitted.] The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'[Citation.]"   (<u>Ashe v. Swenson</u> (1970) 397 U.S. 436, 444.)

Where there is no dispute as to the facts, whether a defendant has been formerly in jeopardy for the same offense is a question of law for the court and not one of fact for the jury.  (<u>People v. Conson</u> (1925) 72 Cal.App. 509, 511.)

A double jeopardy or collateral estoppel claim is forfeited on appeal unless it was first presented in the trial court. (<u>People v. Belcher</u> (1974) 11 Cal.3d 91, 96; <u>People v. Neely</u> (1999) 70 Cal.App.4th 767, 782–783; <u>People v. Morales</u> (2003) 112 Cal.App.4th 1176, 1186; <u>People v. Gillard</u> (1997) 57 Cal.App.4th 136, 160.)  Appellant raised both double jeopardy and collateral estoppel claims in the points and authorities supporting the dismissal motion. Therefore, the points were preserved for appellate review.

**C. The People were not collaterally estopped from retrying the gang and firearm allegations.**

Appellant argues <u>Allen</u> and <u>Davis</u> are not controlling and the trial court erred by failing to apply the collateral estoppel rule to preclude retrial of the enhancements. We are not persuaded.

In <u>Allen, supra</u>, 41 Cal.App.3d 821, the victim was shot in the chest with a revolver. Defendant was charged with murder (count 1) and assault with a deadly weapon (count 2); a firearm enhancement was attached to each count. The jury was instructed to determine whether defendant used a firearm only if it found him guilty on either or both of the substantive crimes. The jury acquitted defendant on count 1 and deadlocked on count 2. The jury filled out the verdict form on the firearm enhancement attached to count 1, finding that it was not true.

The issue on appeal was whether the jury's finding, in connection with the acquittal on count 1 that defendant was not using a firearm, barred retrial on count 2. The appellate court concluded the jury's not true finding on the firearm allegation was surplusage that did not have any legal effect. It analogized the jury's finding to a lenity recommendation.  A lenity recommendation "is extraneous because punishment is not a jury function and thus beyond the scope of its duties. Likewise, when the jury made a special finding after reaching a verdict of not guilty, which it should have made only if it found defendant guilty, the finding would be discarded as beyond the scope of its duties. [Citation.]"  (<u>Davis, supra</u>, 202 Cal.App.3d at p. 1015.)  After examining the record, the court decided it was probable that the jury simply forgot that under the court's instructions it was not to consider the firearm enhancement attached to count 1 unless it found defendant guilty of attempted murder and that it could throw away the verdict forms associated with this count once it acquitted defendant on that count.  "[F]eeling that it had to do something more ceremonial with all verdict forms relating to count 1 and unable to say that defendant used a gun in committing an offense of which he was to be acquitted, the jury found—quite logically—that in not committing the offense he did not use a firearm."  (<u>Allen, supra</u>, 41 Cal.App.3d at p. 827.)

In Davis, supra, 202 Cal.App.3d 1009, this court discussed Allen in concluding that a defendant who was found guilty of second degree murder but found not guilty of involuntary manslaughter was not entitled to reversal on the theory that the conviction was inconsistent with the acquittal on a lesser included offense.  We determined that defendant was not entitled to reversal simply "because of a technical error—the jury filled in the two manslaughter verdicts rather than leaving them blank as it was instructed to do once it reached a guilty verdict on one of the murder counts.  Appellant suffered no injustice because of the errors and we can think of no policy which would be served by reversing appellant's conviction based on this clearly procedural error." (Id. at p. 1017.)

Appellant urges this court to reject Allen because it is "rather short and superficial" and did not explicitly discuss the collateral estoppel rule. As to appellant's contention that brevity indicates an absence of intellectual depth, it is sufficient to comment that the Gettysburg Address consists of 256 words. We are persuaded by respondent's position that while the Allen court did not explicitly discuss the collateral estoppel rule, it essentially conducted the type of analysis our Supreme Court has determined should be undertaken when considering a collateral estoppel issue.  As previously explained, the court is to conduct a practical examination of the entire record of the prior proceedings, taking account of all of the circumstances, in order to determine "'whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" (Ashe v. Swenson, supra, 397 U.S. at p. 444.)  In Allen, the court conducted this type of examination. Therefore, we find Allen to be persuasive authority.

Having examined the entire circumstances in this matter we discern no basis to reverse the lower court's ruling.  It is apparent that the first jury did not follow their instructions to consider the special allegations only if they found appellant guilty of murder.  It is evident from the jury's colloquy with the court that they did not actually consider the merits of the special allegations. They decided appellant was not guilty of first degree murder but were irreconcilably divided on the question whether appellant was guilty of second degree murder. After declaring a mistrial, the court sent the jurors back to the jury room with directions to read CALCRIM No. 640 and complete the verdict form on the murder charge.  After only a brief recess, the jurors returned with completed verdict forms not just on first degree murder but on all the special allegations attached to the murder charge.  It is apparent that the jurors did not understand how to complete the verdict forms.  As the trial court pointed out, if the jury had actually determined that it was not true that a principal used a firearm during the commission of the homicide, then they would have found appellant not guilty on all homicide charges since the undisputed evidence at trial proved Marquez died as a result of multiple gunshot wounds. The People did not present any alternative theory for the murder other than Cisneros shot Marquez while appellant acted as the lookout. Logically, the jury could not have been deadlocked on the question of second degree murder if it had unanimously decided that a principal did not fire a weapon during the commission of the homicide.

Since the jury did not have any authority to consider the special allegations in the absence of a guilty verdict on the murder charge and it is apparent from the record that the jury did not necessarily consider and decide the factual questions posed by the special allegations, we hold that the prosecution was not bound by the unauthorized findings. Appellant had no legitimate expectation that the unauthorized not true findings on the special allegations would preclude retrial of these allegations during the second trial. (Allen, supra, 41 Cal.App.3d at p. 827; Davis, supra, 202 Cal.App.3d at p. 1017.)

Were we to conclude otherwise, the People actually would have been precluded from retrying appellant for second degree murder because the sole theory of the case was that a principal, i.e., Cisneros, shot and killed Marquez. If the People were collaterally estopped from presenting evidence about Cisneros's firearm use because of the unauthorized not true finding on the firearm allegation, then the People would not have had any factual theory upon which they could have retried appellant.

1

2

3

> Accordingly, we conclude the special allegations were not actually and necessarily decided in the first trial. Fundamental principles of fairness do not require us to give any weight to the first jury's unauthorized findings on the special allegations. Therefore, we find the People were not collaterally stopped from retrying the special allegations and uphold the denial of the dismissal motion.

4

(LD 1, pp. 13-20).

5

       2.  Federal Standard.

6

      The Double Jeopardy Clause of the Fifth Amendment, as applied to the states by the Fourteenth

7

Amendment, prohibits re-prosecution following acquittal. Benton v. Maryland, 395 U.S. 784, 89 S.Ct.

8

2056, 23 L.Ed.2d 707 (1969). Because the constitution thus provides that a defendant may not be

9

forced to "run the gantlet" a second time, the guarantee against double jeopardy incorporates the

10

principle of collateral estoppel. Ashe v. Swenson, 397 U.S. 436, 445–446 (quoting Green v. United

11

States, 355 U.S. 184, 190 (1957)). The constitutional guarantee against double jeopardy includes the

12

concept of collateral estoppel. See Ashe v. Swenson, 397 U.S. at 445; United States v. James, 109 F.3d

13

597, 600 (9th Cir.1997); Newton v. Superior Court of California, 803 F.2d 1051, 1057 (9th Cir.1986),

14

cert. denied, 481 U.S. 1070 (1987). Collateral estoppel means that "when an issue of ultimate fact has

15

once been determined by a valid and final judgment, that issue cannot again be litigated between the

16

same parties in any future lawsuit." Ashe, 397 U.S. at 443.  Collateral estoppel analysis involves a

17

three-step analysis:

18

19

20

21

22

23

> First, the issues in the two actions are identified so that we may determine whether they are sufficiently similar and material to justify invoking the doctrine. Second, we examine the first record to determine whether the issue was fully litigated. Finally, from our examination of the record, we ascertain whether the issue was necessarily decided. James, 109 F.3d at 600 (quoting United States v. Schwartz, 785 F.2d 673, 681 (9th Cir.1986). When an element of the crimes charged in successive prosecutions is identical, the "similar and material" prong is satisfied. United States v. Ford, 371 F.3d 550, 556 (9th Cir.2004) ("objective activity" requirements under sections 21 U.S.C. § 856(a)(1) and (a)(2) are identical). The determination of whether the issue was "necessarily decided" turns on whether an issue of fact or law was "actually litigated and determined by a valid and final judgment, and ... is essential to the judgment." Bobby v. Bies, 129 S.Ct. 2145, 2152-53 (2009) (internal citation omitted).

24

The earlier determination (whether it be by judge or jury) must be given the most rational interpretation

25

possible.  See United States v. Carbullido, 307 F.3d 957, 961-62 (9th Cir.2002) (judge's decision at

26

bench trial finding defendant not guilty by reason of insanity of the one arson charged precluded a

27

second prosecution for another arson in the string of nine arsons listed in the stipulation of facts upon

28

which the judge's decision rested). The petitioner bears the burden of showing that the issue whose

10

1   relitigation he wishes to foreclose in a second proceeding was actually decided in the first one, and that

2   no rational jury could have grounded its verdict on an issue other than the one the petitioner seeks to

3   foreclose.  Santamaria v. Horsley, 133 F.3d 1242, 1246 (9th Cir.1998) (en banc), amended, 138 F.3d

4   1280 (9th Cir.1998); see, e.g., Wilson v. Bellevue, 554 F.3 816, 829-30 (9th Cir.2009) (acquittal on

5   intentional murder theory did not demonstrate that the jury necessarily decided issues that would bar a

6   later prosecution on a felony murder theory under Oregon law); Dowling v. United States, 493 U.S.

7   342, 350-351 (1990).

8          In a federal habeas proceeding involving a claim that retrial of the allegedly precluded issue

9   would violate double jeopardy protections, the preclusive effect of the first jury verdict is a question of

10  federal law but the state's highest court's interpretations of state law are binding. Santamaria, 138 F.3d

11  1245.  Finally, if a petitioner has presented his collateral estoppel/double jeopardy claim to the

12  California Court of Appeal and to the California Supreme Court, this court may address the claim;

13  petitioner does not have to wait until he is retried to seek federal habeas relief. See id. at 1243; Thomas

14  v. Municipal Court, 878 F.2d 285, 287 n. 1 (9th Cir.1989).

15             3.  Analysis.

16         The Court has been unable to locate, and petitioner has failed to cite, any authority, let alone -

17  Supreme Court authority, holding that double jeopardy bars the retrial of special allegations when the

18  jury in the first trial was not able to reach a verdict on the underlying substantive offenses.  Moreover,

19  the Double Jeopardy Clause did not preclude the retrial of the special allegations of which petitioner

20  was charged.  See Monge v. California, 524 U.S. 721, 727, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998)

21  (noting that the Supreme Court historically has found double jeopardy protections inapplicable to

22  sentencing proceedings, including prior conviction allegations, "because the determinations at issue did

23  not place the defendant in jeopardy for an 'offense.'"); United States v. Scott, 437 U.S. 82, 97, 98 S.Ct.

24  2187, 57 L.Ed.2d 65 (1978) ("[A] defendant is acquitted only when 'the ruling of the judge, whatever

25  its label, actually represents a resolution [in the defendant''s favor], correct or not, of some or all of the

26  factual elements of the offense charged[.]'").

27         Although Petitioner would have the Court ignore the principals enunciated in these authorities,

28  the simple fact is that, in his first trial, Petitioner was not convicted of any substantive criminal offense.

1   That being the case, the jurors were not permitted to make any determinations on the special

2   allegations.  See People v. Bright, 12 Cal.4th 652, 661 (1996) ("The jury does not decide the truth of

3   the penalty allegation until it first has reached a verdict on the substantive offense charged."), *cert.*

4   *denied*, 518 U.S. 1006 (1996).  Hence, the 5th DCA's observations that, by filling out the special

5   allegation verdict form, it was obvious "the jurors did not understand how to complete the verdict

6   forms;" "the jury did not have any authority to consider the special allegations in the absence of a guilty

7   verdict on the murder charge;" and "it is apparent from the record that the jury did not necessarily

8   consider and decide the factual questions posed by the special allegations."  Under those circumstances,

9   it cannot reasonably be said the jury actually "decided" the issue of the special allegation.  James, 109

10  F.3d at 600 (quoting United States v. Schwartz, 785 F.2d 673, 681 (9th Cir.1986).  Because the issue

11  was not actually decided by jurors at the first trial, neither collateral estoppel nor double jeopardy

12  principles foreclose a retrial of the enhancement issues. James, 109 F.3d at 600; Schwartz, 785 F.2d at

13  681.  Thus, it cannot be said the state court's adjudication rejecting Petitioner's claim was objectively

14  unreasonable.

15       **B.  Refusal To Discharge Juror No. 9**

16       Petitioner next contends the trial court erred in refusing the discharge Juror no. 9, finding that

17  he/she could be fair and impartial and had not concealed a bias.  This contention is also without merit.

18       **1.  The 5th DCA's Opinion.**

19  The 5th DCA rejected Petitioner's claim as follows:

20  A. Facts

21  i. Voir Dire

22  During voir dire the judge informed the prospective jurors that there was a gang allegation in
    this case.  He asked, "Is there anybody here, either yourself or close friends or relatives have

23  been or are in a street gang?"  Juror No. 9 responded, "I have a family member that's involved
    in it, but I don't—I stay away. It doesn't bother my mind at all. I'm not involved, and I don't care

24  to be.  So I just wanted to let you know that I do have family members."  The judge asked juror
    No. 9 if he/she could decide this case on the evidence presented and he/she answered: "Yes. It

25  doesn't bother me."

26  Juror No. 9 also disclosed that one of his/her cousins had been accused of murder about a year
    ago. This juror answered affirmatively when the court asked if he/she could set this aside and

27  decide the case based on the evidence.

28  Defense counsel and the prosecutor both questioned juror No. 9.  Neither the prosecutor nor
    defense counsel asked juror No. 9 about the gang connections of his/her family or asked if this

juror was personally allied with a gang.

Juror No. 9 answered basic biographical questions during which it was ascertained that he/she was employed as a food server. He/she was married and had three children.

Neither the prosecutor nor defense counsel exercised a peremptory challenge on juror No. 9 or asked the court to excuse him/her for cause.

ii. Proceedings during trial

The prosecutor asked witness Eliseo Sanchez (Eliseo) if he knew a person named Alex Sanchez (Alex). Eliseo responded in the negative. After being shown a document, Eliseo testified that Alex was a Norteno.

Juror No. 9 passed a note to the judge which stated, "I [know] Alex Sanchez. [Lived] in the same house when he died. Don't know if that is ok!"

Outside the presence of the other jurors, the court questioned juror No. 9 about this note. Juror No. 9 stated:

> "If it's the same Alex Sanchez from Tulare that shot himself, that's the Alex I'm talking about. I don't know if it's Alex from Pixley, but I only know one Alex Sanchez, and I know he passed away around that time. So that's why I thought I should let you know that. I lived with him at the time. I was dating his [sibling]. He was like my little brother."

It was ascertained that juror No. 9 and the prosecutor were both referring to the same Alex Sanchez.

The court said that a poster on which "In Memory of Alex," was written was going to be used as part of the basis for the gang expert's testimony.

Defense counsel asked the court, "Can I ask [him/her]?"

Instead of replying to defense counsel, the judge asked juror No. 9, "Is that going to affect your ability to sit fairly in this case in any way?"  He/she replied, "If it doesn't have nothing to do with him, no."  The court said, "It doesn't."  He/she responded, "If it doesn't, then no."

Defense counsel asked the court if he could ask juror No. 9 some questions. The court directed counsel to approach the bench; an off-the-record discussion occurred.

Then the judge asked juror No. 9, "The fact that he was Norteno-associated and defendant here may be Sureno-associated, is that going to affect your ability to be fair in this?"

Juror No. 9 replied, "Maybe a little bit."  Then he/she continued, "I'm not saying that—I still have to see everything, so I can't say—"   The judge said, "That's what we're asking."   He/she said, "No."

The court asked, "You could see the evidence and decide this based on the evidence?"

Juror No. 9 replied: "Like, okay, put it this way. Right now I can't say he's guilty or not guilty. Just because he's a Sureno, that doesn't have nothing to do with me. I don't claim.  My family does, but that has nothing to do with me."

The court asked juror No. 9 if he/she would be influenced because the defendant is a Sureno.

1    Juror No. 9 replied, "I don't claim, so I don't care about that."

2    The court thanked juror No. 9 and concluded the discussion.

3    Neither defense counsel nor the prosecutor asked the court to excuse juror No. 9.

4    On the next court day, a discussion was conducted in chambers. In relevant part, defense
     counsel said:

5
         "I'm not complaining about anybody. Luis Aguilar, who is [appellant's] brother, advised
6        me that the ... juror who knew the Norteno in the Memorial thing has like a gang tattoo
         and was in the hallway playing ... phone rap music that was Norteno rap music, making
7        derogatory terms to Surenos calling them Surrattas or whatever."

8    The judge asked, "The rap music was or [he/she] was?"

9    Defense counsel replied:

10       "The music [he/she] was listening to. And I heard [him/her] playing music, but I wasn't
         paying attention to it. And I myself did see that [he/she] has a big red star tattooed on
11       [his/her] neck. And I just wanted to bring it to [the] Court's attention so that the Court
         could deal with it how he sees proper."

12
     The judge asked, "Well, what do you suggest? We've already talked to [him/her]."

13
         Defense counsel said,
14
         "Yeah. And I remember what [he/she] said. I just—I wanted to just maybe follow-up.  I
15       don't know if it's too late in the game to just ask [him/her] if, you know, if [he/she] sides
         one side or anything like that.  [He/she] had mentioned that [he/she] has family that were
16       gangs, and that [he/she] knew that person.  But it was never really brought up that if
         [him/her] family's, you know—if [he/she] would tend to side with a gang or be biased
17       against my client because he's in a rival gang."

18   The judge said, "I think I asked [him/her] that directly." Defense counsel said, "Okay."  The
     court stated that it would ask the court report to verify its recollection. Defense counsel said,
19   "However you see proper. I'm not trying to--" The judge said, "No. That's appropriate."

20   Then the judge asked, "What's a red star? That's a new one on me."

21   Defense counsel replied, "It's a North Star. It's called like the North Star, and it's in red."

22   The prosecutor said, "Dilbeck talked about it at the last trial when he was looking at some of
     those things about the stars.  It's in the transcript of the last trial. That north, North Star, I don't
23   know ... [¶] ... [¶] ... [t]he constellation they're referring to."

24   Defense counsel said, "Something like that. But basically North Star, and it's in red. Apparently
     his witness Ramon Pulido had seen that underneath it. It had some writing with a big N on it,
25   something like that."

26   The prosecutor asked, "On [him/her]?" Defense counsel replied, "Yeah."

27   The judge asked, "When are these guys seeing this stuff?"

28   Defense counsel said, "Apparently in the hallway. Because I saw [him/her] when I was—I
     distanced myself."

                                                    14

The judge asked, "I got one question. What are they doing close enough to the jurors to be able to see that?"

Defense counsel replied, "I think if they were—I don't know—I didn't talk to Mr. Pulido who noticed that.  I saw the star on the neck.  But earlier I distanced myself way on the far end, and [he/she] was blasting the music on [his/her] phone, rap music. And I wasn't paying attention. I was reading."

The judge directed defense counsel, as follows:  "Well, maybe you can check after we adjourn. It shouldn't be that hard to find.... I think I asked [him/her] a direct question about would one— north versus south cause you to--"  Defense counsel interrupted, saying, "Okay."  The judge continued, "I think we got a direct answer to the question. So let's check that out and then we'll take it up after that."  Defense counsel said, "Okay. Thank you."

Later that day, outside the presence of the jury, the judge stated that the reporter's transcript reflected that juror No. 9 "was directly asked, 'Just because he was Sureno that doesn't have nothing to do with me. I don't claim.'"  Defense counsel replied, "Okay."  The judge continued:

> "'The family does.' And I asked specifically, 'The fact that he's a Norteno, is that going to affect your ability?' At first [he/she] said, 'Maybe a little bit.' Then [he/she] backs off and says, 'I'm not saying that. I still have to see everything.'  'That's what we're asking. You could see the evidence, decide it based on the evidence?''  'I don't claim.' Then [he/she] says later, 'Because he's a Sureno, therefore'—'I don't claim so I don't care about that.'"

Defense counsel said, "Okay."  The judge said, "So I think that's covered."

Defense counsel did not ask the court to dismiss juror No. 9 at any point during the trial or assert that he/she had concealed material information during voir dire.

iii. Posttrial proceedings—new trial motion

Appellant filed a written motion for new trial. In relevant part, he argued juror No. 9 committed misconduct by concealing his/her bias against appellant because of his Sureno gang affiliation.

Defense counsel filed a supporting declaration in which he alleged juror No. 9 "played Norteno rap in front of fellow jurors and the defendant's family in the courthouse hallway."  Also, juror No. 9 "had a red star tattoo and wore stars throughout trial indicative of Norteno gang affiliation."  Further, juror No. 9 "lived [in the same house] with a deceased Norteno gang member Alex Sanchez."

Appellant filed a declaration in which appellant alleged that a fellow prisoner, Abel Vasquez, told appellant that he knew juror No. 9 and he/she voted in favor of guilt because he/she was scared of appellant.

The motion was denied after hearing. In relevant part, the court reasoned:

> "[¶] And here there were three allegations of misconduct. The first was as to juror number nine, allegations relating to playing Norteno rap music in the hallway. And as to that, there really was no admissible evidence that, in fact, it was Norteno rap music. There's no foundation to prove that it was.

> "But even if it were, it didn't establish misconduct, because juror number nine was the one who very frankly revealed [his/her] family gang connections. [He/she] disclosed a connection with a person in a photo. [He/she] was questioned about that and stated that [he/she] felt [he/she] could be fair."

The court also stated:

> "[¶] ... [T]he cases, in fact, require as part of a declaration and as part of the defendant's showing evidence that neither the defendant nor the defendant's counsel were aware of the misconduct.
>
> "And this would apply certainly to the hallway rap music allegation where I'm denying.... And as I did state before, a person can't use as the basis for a motion for new trial conduct which might have been cured if timely reported.
>
> "You're not allowed to gamble on the outcome while secretly preserving the error in the event of an unfavorable verdict."

**B. Appellant did not prove that juror No. 9 concealed a Norteno affiliation, a bias against Surenos or otherwise committed misconduct**.

A juror's concealment of bias constitutes misconduct and is ground for a new trial. (People v. Nesler (1997) 16 Cal.4th 561, 581–582 (Nesler).)   "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.]"   (In re Hitchings (1993) 6 Cal.4th 97, 111.)

Where a party seeks a new trial based upon jury misconduct, the court must undertake a three-step inquiry.  First, it must determine whether the evidence presented for its consideration is admissible.  If it finds the evidence is admissible, it must then consider whether the facts constitute misconduct.  If misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial.  Reversal is required unless the reviewing court finds there is no substantial likelihood that a juror was improperly influenced against the defendant. A reviewing court will uphold the trial court's ruling on a new trial motion unless it clearly appears that a manifest and unmistakable abuse of discretion occurred. (People v. Duran (1996) 50 Cal.App.4th 103, 112–113.)

We agree with respondent that appellant did not present admissible evidence proving juror misconduct.  Appellant mistakenly treats the hearsay assertions in defense counsel's declarations as established facts. During trial, defense counsel told the court that he was not paying attention to the music he heard juror No. 9 playing.  Defense counsel did not have any personal knowledge whether the music was Norteno rap. Also, defense counsel did not report to the court that he saw the letter N inside the star that was tattooed on juror No. 9's neck. Ramon Pulido, who allegedly saw the letter N inside the tattooed star, did not testify to this fact at trial or submit a declaration supporting the new trial motion.

In the absence of evidence proving that juror No. 9 was listening to Norteno rap or that the tattoo on his/her neck definitely signified a personal Norteno affiliation, there was no admissible evidence supporting appellant's assertion that juror No. 9 concealed facts indicating a bias against Surenos.

Juror No. 9 disclosed during voir dire that some of his/her family members were affiliated with the Nortenos and during trial disclosed that he/she lived with the family of a Norteno member. Acquaintance alone does not imply bias.  (See, e.g., People v. Cochran (1998) 62 Cal.App.4th 826, 831.)  When questioned by the court during trial after he/she disclosed that he/she had resided with Alex Sanchez and his family, he/she affirmed that he/she could be fair and was not biased against defendant because of his Surenos affiliation.

Therefore, we conclude the record does not contain admissible evidence supporting appellant's claim that juror No. 9 concealed a bias against Surenos or that he/she failed to disclose material information during voir dire. Therefore, we uphold the denial of the new trial motion on this basis.

16

1    (LD 1, pp. 20-27).

2              2.  Federal Standard.

3              Though Petitioner contends the trial judge erred when refusing to dismiss juror no. 9, such a

4    contention is not cognizable in federal habeas proceedings.  Generally, issues of state law are not

5    cognizable on federal habeas.  Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475 (1991) ("We have

6    stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting*

7    Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993)

8    (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

9    constitutional violation, may not be corrected on federal habeas").  Indeed, federal courts are bound by

10   state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th

11   Cir.)(1989). Further,"the availability of a claim under state law does not of itself establish that a claim

12   was available under the United States Constitution." Sawyer v. Smith, 497 U.S. 227, 239, 110 S.Ct.

13   2822 (1990), *quoting,* Dugger v. Adams, 489 U.S. 401, 409 (1989). Thus, insofar as Petitioner's claim

14   is premised upon the state court's misapplication of California law, it is not cognizable in these

15   proceedings.

16             In any event, Petitioner's claim is without merit.  "In all criminal prosecutions," state and

17   federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury."  U.S. Const., Amends. 6

18   and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968); Irvin v. Dowd, 366 U.S. 717, 722 (1961).

19   When a petitioner challenges a California trial court's failure to remove a juror, the reviewing court

20   need only decide whether the application of California's procedure violated the petitioner's Sixth

21   Amendment rights. Perez, 119 F.3d at 1426. To make this decision, the reviewing court must determine

22   whether good cause existed to support the court's decision not to remove the juror.  Id. In making this

23   determination, the reviewing court must be mindful that a trial court's findings regarding juror fitness

24   are entitled to special deference.  Id. (citing Patton v. Yount, 467 U.S. 1025, 1036–38 & n. 12 (1984)).

25   A trial judge's exercise of the responsibility to be "ever watchful to prevent prejudicial occurrences and

26   to determine the effect of such occurrences when they happen," Smith, 455 U.S. at 217 n. 7, inherently

27   involves the court's "appraisal of witness credibility and demeanor."  Thompson v. Keohane, 516 U.S.

28   99, 111 (1995).  Because trial judge is best positioned to make decisions regarding credibility and

1   demeanor, the "judgment of the jurist-observer" has been given "presumptive weight" in these matters.

2   Id. Thus, juror impartiality is a factual issue within the statutory presumption of correctness.  Id.;

3   Wainwright v. Witt, 469 U.S. 412, 429 (1985); Tinsley, 895 F.2d at 525 ("findings of state trial and

4   appellate courts on juror impartiality deserve 'a high measure of deference.'"); Skilling v. United

5   States, __U.S.__, 130 S.Ct. 2896, 2918 (2010)("reviewing courts are properly resistant to second-

6   guessing the trial judge's estimation of a juror's impartiality…..").

7               3.  Analysis.

8          Here, as mentioned, in rejecting Petitioner's claim as to juror no. 9, the state court pointed out

9   that the trial judge spoke directly with juror no. 9 before initially declining to dismiss him/her, and then,

10  after further consideration, deciding that dismissal was not required.  The 5th DCA also noted that

11  Petitioner failed to present admissible evidence proving juror misconduct, that hearsay statements in

12  defense counsel's declarations were not "established facts," that counsel was not paying attention when

13  he heard the rap music supposedly showing juror no. 9's support for Norteno gangs, that counsel had no

14  personal knowledge even whether the music was "Norteno" rap, that counsel did not personally see the

15  red letter "N" on juror no. 9, and that the one witness who claimed to have seen the red letter did not

16  testify to that fact or submit a declaration.

17         In the absence of competent admissible evidence establishing that juror No. 9 was listening to

18  Norteno rap or that the tattoo on his/her neck definitely signified a personal Norteno affiliation, there

19  was no admissible evidence supporting appellant's assertion that juror No. 9 concealed facts indicating

20  a bias for Nortenos or a prejudice against Surenos. As the state court explained:

21         Juror No. 9 disclosed during voir dire that some of his/her family members were affiliated with
           the Nortenos and during trial disclosed that he/she lived with the family of a Norteno member.
22         Acquaintance alone does not imply bias.  (See, e.g., People v. Cochran (1998) 62 Cal.App.4th
           826, 831.)  When questioned by the court during trial after he/she disclosed that he/she had
23         resided with Alex Sanchez and his family, he/she affirmed that he/she could be fair and was not
           biased against defendant because of his Surenos affiliation.
24
           Therefore, we conclude the record does not contain admissible evidence supporting appellant's
25         claim that juror No. 9 concealed a bias against Surenos or that he/she failed to disclose material
           information during voir dire. Therefore, we uphold the denial of the new trial motion on this
26         basis.

27  (LD 1, p. 27).

28         Under these circumstances, and giving the trial court the requisite "special deference" on the

1   factual determination as to juror no. 9's fitness to deliberate, the state court's reasons for upholding the

2   trial court's refusal to dismiss juror no. 9 were more than sufficient to satisfy federal constitutional

3   concerns.  In sum, juror no. 9 brought the matter to the court's attention, the judge carefully and

4   thoroughly inquired into the matter and the juror assured the court that he/she could be fair and

5   impartial.  Absent admissible evidence that juror no. 9 actually concealed vital information or deceived

6   the court with his/her answers, there is simply no basis to depart from the conclusion reached by the

7   state court.

8          In his Traverse, Petitioner contends that the trial judge's failure to remove juror no. 9 was not

9   "reasoned" because the juror "was biased and concealed that bias both before and during the trial."

10  (Doc. 21, p. 13).  However, such assertions are mere speculation unsupported by any probative facts.

11  Again, as the 5th DCA pointed out, it was juror no. 9 who brought his/her attenuated connection to the

12  Norteno gang to the judge's attention.  It was juror no. 9 who disavowed being part of any street gang.

13  And it was juror no. 9 who strongly indicated that he/she would base any verdict on the facts and

14  evidence, not on any pre-conceived bias or prejudice toward street gangs and their members.  Petitioner

15  is not entitled to a re-trial simply because he repeatedly asserts, without proof, that the juror was biased

16  or prejudiced.  There is no authority that would support a presumption of bias or prejudice: it must be

17  proven.  In Petitioner's case, it was not.

18         C.  Sufficiency Of The Evidence Regarding The Street Gang Enhancement.

19         Petitioner contends there was insufficient evidence to support the street gang enhancement.  The

20  court disagrees.

21             1.  The 5th DCA's Opinion.

22  The 5th DCA rejected Petitioner's claim as follows:

23  A. The substantial evidence standard of review applies.

24  When reviewing a challenge to the sufficiency of the evidence, we assess the entire record in the
    light most favorable to the judgment below to determine whether it contains substantial
25  evidence from which a reasonable trier of fact could find the defendant guilty beyond a
    reasonable doubt.  (People v. Johnson (1980) 26 Cal.3d 557, 578.)  "This standard applies to a
26  claim of insufficiency of the evidence to support a gang enhancement."  (People v. Vy (2004)
    122 Cal.App.4th 1209, 1224.)  "The standard is the same, regardless of whether the prosecution
27  relies mainly on direct or circumstantial evidence. [Citation.]"  (People v. Vazquez (2009) 178
    Cal.App.4th 347, 352 (Vasquez).)

28
    In applying the substantial evidence standard of review, the appellate court adopts all reasonable

19

inferences and presumes in support of the judgment the existence of every fact that a jury reasonably could have deduced from the evidence.  The trier of fact makes credibility determinations and resolves factual disputes. An appellate court will not substitute its evaluation of a witness's credibility for that of the fact finder.  "It is the jury, not this court, that must be convinced beyond a reasonable doubt that the gang enhancement allegation is true. [Citation.]" (Vasquez, supra, 178 Cal.App.4th at p. 352.)

B. Section 186.22, subdivision (b)(1) did not require the People to prove appellant committed the substantive offense with the specific intent to facilitate additional and separate criminal conduct by gang members.

In relevant part, section 186.22, subdivision (b)(1), provides for a sentence enhancement when a defendant commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...."

In Garcia v. Carey (9th Cir.2005) 395 F.3d 1099 (Garcia) and Briseno v. Scribner (9th Cir.2009) 555 F.3d 1069 (Briseno), the Ninth Circuit held that the specific intent requirement of section 186.22, subdivision (b) requires some evidence supporting an inference that the defendant committed the crime with the specific intent to facilitate separate additional criminal conduct by gang members.  The People are required to produce evidence describing "what criminal activity of the gang was ... intended to be furthered" by the charged crime.  (Garcia, supra, 395 F.3d at p. 1103; see also Briseno, supra, 555 F.3d at p. 1079.)

Relying on these Ninth Circuit cases, appellant argues the true finding on the gang enhancement must be reversed because the record lacks proof that he committed the substantive offense with the specific intent to facilitate separate and additional criminal conduct by gang members.  We are not convinced.  As will be explained, the Ninth Circuit has misinterpreted section 186.22, subdivision (b)(1).

As lower federal court decisions, Garcia and Briseno are not binding on this court. (People v. Hoag (2000) 83 Cal.App.4th 1198, 1205.)  No California Court of Appeal has accepted the Ninth Circuit's interpretation of section 186.22, subdivision (b)(1).  The California appellate courts that have considered this issue unanimously agree there is no statutory requirement that the "criminal conduct by gang members" referenced in section 186.22, subdivision (b)(1) must "be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing."(Vazquez, supra, 178 Cal.App.4th at p. 354; see also People v. Romero (2006) 140 Cal.App.4th 15, 19 (Romero); People v. Hill (2006) 142 Cal.App.4th 770, 774 (Hill).) Vasquez cogently explains:

> "[¶] While our Supreme Court has not yet reached this issue, numerous California Courts of Appeal have rejected the Ninth Circuit's reasoning. As our colleagues noted in [Romero, supra, 140 Cal.App.4th at p. 19]: 'By its plain language, the statute requires a showing of specific intent to promote, further, or assist in "any criminal conduct by gang members," rather than other criminal conduct. (§ 186.22, subd. (b)(1), italics added.)' Thus, if substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members. [Citation.]
>
> "Like the Romero court, we reject the Ninth Circuit's attempt to write additional requirements into the statute.  It provides an enhanced penalty where the defendant specifically intends to 'promote, further, or assist in any criminal conduct by gang members.'  (§ 186.22, subd. (b)(1).)  There is no statutory requirement that this 'criminal conduct by gang members' be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in

committing."  (Vasquez, supra, 178 Cal.App.4th at pp. 353–354.)

For the reasons expressed in Vasquez, Romero and Hill, we reject the Ninth Circuit's interpretation of section 186.22, subdivision (b)(1), and decline to follow Briseno and Garcia.

C. Deputy Aguilar's opinion has sufficient foundation and there is substantial evidence proving the murder benefited the Surenos.

We now consider the sufficiency of the evidence proving that the murder was committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).)   Appellant argues that Deputy Aguilar's testimony was speculative. We are not persuaded.  As will be explained, there was adequate evidentiary foundation for Deputy Aguilar's opinions.  The People met their burden of proving the benefit element of the gang enhancement.

Evidence that a crime would enhance a gang's status or reputation or that it would intimidate rival gangs or potential witnesses within the gang's territory, is sufficient to support a finding that the crime was "for the benefit of" the gang.  (See People v. Garcia (2007) 153 Cal.App.4th 1499, 1504–1506, 1511–1512 & People v. Morales, supra, 112 Cal.App.4th at p. 119.) Generally, the testimony of a single witness is sufficient to prove a disputed fact.  (People v. Young (2005) 34 Cal.4th 1149, 1181.)  This topic is a proper subject for expert testimony. (People v. Zepeda (2001) 87 Cal.App.4th 1183, 1207–1209.)  An expert may rely on hearsay in forming his or her opinion. (People v. Catlin (2001) 26 Cal.4th 81, 137.)  Yet, "'[l]ike a house built on sand, the expert's opinion is no better than the facts on which it is based.'[Citation.]" (People v. Gardeley (1996) 14 Cal.4th 605, 618.)

> "[¶] A gang expert's testimony alone is insufficient to find an offense gang related. [Citation.]  '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang.'[Citation.]" (People v. Ochoa (2009) 179 Cal.App.4th 650, 657 .)

It is undisputed that the Surenos is a criminal street gang and that appellant is a member of this gang. Both the People's gang expert and the defense's gang expert testified that appellant was a Sureno.  Deputy Aguilar testified that assault with a deadly weapon was one of the Surenos's primary criminal activities. In challenging the foundation for Deputy Aguilar's opinion that the murder benefited the Surenos, appellant fails to recognize the significance of the fact that he, a Sureno, assisted in the murder of Marquez, a Norteno.  Nortenos and Surenos are enemy gangs. Appellant previously had been involved in a fight with Marquez.  Thus, irrespective of Cisneros's desire to retaliate against Marquez because of the car theft, there was a gang-related reason for appellant to participate in Marquez's murder.  Deputy Aguilar explained,

> "Any time there's a confrontation between two rival gangs, one has to do something about it. To not retaliate in some way on would show a weakness on your part.... [¶] ... [¶] ... It would show the subject that he himself was personally weak and that his gang was weak."

Appellant's affiliation with the Surenos and his prior fight with Marquez are foundational facts providing evidentiary support for Deputy Aguilar's opinion that murder benefited the Surenos, because failing to retaliate against Marquez after the fight would cause other gang members and associates to view appellant and the Surenos as weak.  By participating in the murder, appellant eliminated a rival gang member who had disrespected him, thereby increasing his stature and the stature of the Surenos.

Also, there was evidence that Cisneros began associating with Surenos during the months before he killed Marquez.  In fact, five days before the murder Cisneros was with a group of Surenos when they were confronted by a group of Nortenos.  Cisneros fired a handgun onto the ground and the Nortenos left.  Appellant fails to recognize the significance of this act—Cisneros overtly sided against his former gang associates in a dispute between the two rival gangs.

Furthermore, in the hours before the homicide Cisneros and appellant were socializing with a group of people that included Surenos.  They made verbal statements indicating that they were going to kill Marquez.  Then they left the gathering.  This shows that they wanted others to know that they were going to kill Marquez, who was known to be a Norteno.  And they were not just going to kill any Norteno—they targeted a Norteno who previously fought with appellant, a Surenos member, and was believed to have stolen a car belonging to Cisneros, a new Surenos associate.  By killing Marquez, Cisneros demonstrated his commitment to the Surenos.  Appellant proved his strength and the strength of the Surenos.

Considered in their totality, these facts adequately support Deputy Aguilar's testimony that the murder benefited the Surenos.  Accordingly, we reject appellant's contention that Deputy Aguilar's testimony was speculative.

Having carefully examined the record, we conclude that it contains substantial evidence from which a reasonable jury could determine beyond a reasonable doubt that the murder was committed for the benefit of, at the direction of, or in association with the Surenos, with the specific intent to promote, further, or assist in any criminal conduct by gang members.  Therefore, the challenge to the sufficiency of the evidence fails.

(LD 1, pp. 23-26).

　　　　2. Federal Standard.

The law on sufficiency of the evidence is clearly established by Supreme Court of the United States.  Pursuant to the Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319.  Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

22

1  be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

2       If confronted by a record that supports conflicting inferences, a federal habeas court "must

3  presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

4  conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  A

5  jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376

6  F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

7  permit a federal court to revisit credibility determinations.  See id. at 957-958.

8       Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

9  conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  (only speculation supported

10 conviction for first degree murder under theory of aiding and abetting). After the enactment of the

11 AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of

12 deference.  Juan H. v. Allen, 408 F.3d 1262, 1274Cir. 2005).  Generally, a federal habeas court must

13 ask whether the operative state court decision reflected an unreasonable application of Jackson and

14 Winship to the facts of the case.  Id. at 1275.[2]

15      In applying the AEDPA's deferential standard of review, this Court must also presume the

16 correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S.

17 436, 459 (1986).  This presumption of correctness applies to state appellate determinations of fact as

18 well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the

19 presumption of correctness does not apply to state court determinations of legal questions or mixed

20 questions of law and fact, the facts as found by the state court underlying those determinations are

21 entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

22      In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the Supreme Court further explained the

23 highly deferential standard of review in habeas proceedings, by noting that Jackson

24       makes clear that it is the responsibility of the jury—not the court—to decide what conclusions
         should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's
25       verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed
         with the jury. What is more, a federal court may not overturn a state court decision rejecting a
26       sufficiency of the evidence challenge simply because the federal court disagrees with the state

27

28 [2] Prior to Juan H., the Ninth Circuit expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional
   degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978,
   983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

23

1  court. The federal court instead may do so only if the state court decision was "objectively

2  unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
   (2010) (internal quotation marks omitted).

3       Because rational people can sometimes disagree, the inevitable consequence of this settled law
        is that judges will sometimes encounter convictions that they believe to be mistaken, but that
4       they must nonetheless uphold.

5  Cavazos, 132 S.Ct. at 3.

6       "Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the
        evidence in the light most favorable to the prosecution, any rational trier of fact could have
7       found the essential elements of the crime beyond a reasonable doubt.' 443 U.S., at 319, 99
        S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of
8       historical facts that supports conflicting inferences must presume—even if it does not
        affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of
9       the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

10 Cavazos, 132 S.Ct. at 6. [3]

11            3.  Analysis.

12       Petitioner relies upon the Ninth Circuit's holdings in Garcia v. Carey, 395 F.3d 1099 (9th Cir.

13 2005), and Briceno v. Scribner, 55 F.3d 1069 (9th Cir. 2009), which, Petitioner contends, "held that

14 criminal street gang enhancement under section 186.22(b) requires a specific intent to facilitate other

15 criminal activities by gang members."  (Doc. 1, p. 21).  However, as Respondent correctly points out,

16 Briceno and Garcia were overruled by the California Supreme Court in People v. Albillar, 51 Cal.4th

17 47, 66 (2010), which held the intent requirement of section 186.22(b)(1) "is unambiguous and applies

18 to any criminal conduct, without a further requirement that the conduct be 'apart from" the criminal

19 conduct underlying the offense of conviction sought to be enhanced."  Id. (emphasis in original).  The

20 Ninth Circuit has recognized that Albillar overruled Briceno and Garcia and that the California

21 Supreme Court's decision on this matter is "authoritative."  (Emery v. Clark, 643 F.3d 1210, 1215 (9th

22 Cir. 2011).  Indeed, this Court is bound by a state high court's interpretation of its own laws.  Hicks v.

23 Feiock, 485 U.S. 624, 629 (1988) (a determination of state law by a state appellate court is binding in a

24 federal habeas action); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)

25 (federal habeas court must respect a state court's application of its own law and must not engage in de

26

27 _____
   [3] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the
   sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal
28 Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980).
   Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state
   court adjudication was contrary to or an unreasonable application of that standard.

1    novo review); Clemons v. Mississippi, 494 U.S. 738, 739–740 (1990)(federal court has no basis for

2    disputing a state's interpretation of its own law).

3            Applying the above scienter requirement to the facts presented at trial, it is clear that sufficient

4    evidence was presented to support the enhancement.  Petitioner was a member of a criminal street gang,

5    the victim was a member of a rival criminal street gang, Petitioner had previously been involved in a

6    fight with the victim, and Petitioner assisted the gang member who killed the victim.  Under the

7    Jackson standard, this is sufficient to meet the scienter requirement as explained in Albillar.

8            D.    Failure To Discharge Juror No. 3 and Juror No. 9 For Bias

9            Petitioner also contends that the trial court violated his right to a fair trial by failing to discharge

10   Juror nos. 3 and 9 for bias.  This contention is without merit.

11           1.    The State Court Decisions.

12           As mentioned, during the direct appeal, the 5th DCA rejected Petitioner's claim as to juror no. 9,

13   discussed previously.  In habeas corpus proceedings, Petitioner raised the issue of juror bias as to juror

14   no. 3.  The Superior Court rejected the claim as being procedurally barred and rejected the claim as to

15   juror no. 9 on the same grounds.  The Superior Court never considered the claims on their merits.

16   Subsequently, the state appellate courts summarily rejected the claims.  Thus, the last reasoned state

17   court decision denied the claims based on a procedural bar.

18           2.    Federal Standard.[4]

19           The state court rejected the claim against juror no. 9 on the grounds that it had already been

20   litigated in the state court proceedings, citing In re Waltreus, 62 Cal.2d 218 (1965) and In re Harris, 5

21   Cal.4th 813 (1993).  The court rejected the claim against juror no. 3 on the grounds that Petitioner

22   should have raised it in his direct appeal but did not, citing In re Walker, 10 Cal.3d 764, 773-775

23   (1974).

24           Federal courts "will not review a question of federal law decided by a state court if the decision

25   of that court rests on a state law ground that is independent of the federal question and adequate to

26   support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244

27

28   _____
     [4] In a previous section, the Court identified the federal standard for reviewing a claim of juror bias on the merits.  Hence,
     that standard will not be repeated here.

1   F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California,

2   202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if

3   the petitioner has defaulted on the particular state's procedural requirements . . . ."); see also Fox Film

4   Corp. v. Muller, 296 U.S. 207, 210 (1935).  This concept has been commonly referred to as the

5   procedural default doctrine.  This doctrine of procedural default is based on concerns of comity and

6   federalism.  Coleman, 501 U.S. at 730-32.  If the court finds an independent and adequate state

7   procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the

8   procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result

9   in a fundamental miscarriage of justice."  Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993);

10  Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

11          The mere occurrence, however, of a procedural default will not necessarily bar a federal court

12  from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default

13  doctrine to apply and thereby bar federal review, the state court determination of default must be

14  grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.

15  Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put

16  another way, the procedural default doctrine will apply only if the application of the state procedural

17  rule provides "an adequate and independent state law basis" on which the state court can deny relief.

18  Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

19          "For a state procedural rule to be 'independent,' the state law basis for the decision must

20  not be interwoven with federal law."  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing*

21  Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d

22  1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to

23  rest primarily on federal law, or to be interwoven with federal law.'" (*quoting* Coleman, 501 U.S. at

24  735).  "A state law is so interwoven if 'the state has made application of the procedural bar depend on

25  an antecedent ruling on federal law [such as] the determination of whether federal constitutional error

26  has been committed.'"  Park, 202 F.3d at 1152 (*quoting* Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

27          To be deemed adequate, the state law ground for decision must be well-established and

28  consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule

1   constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed'

2   at the time it was applied by the state court.")(*quoting* <u>Ford v. Georgia</u>, 498 U.S. 411, 424, 111 S.Ct.

3   850 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule

4   inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least

5   over time, can become known and understood within reasonable operating limits.'"  <u>Id</u>. at 377 (*quoting*

6   <u>Morales</u>, 85 F.3d at 1392).

7       As to juror no. 9, <u>Waltreus</u> provides that "any issue that was actually raised and rejected on

8   appeal cannot be renewed in a petition for a writ of habeas corpus," <u>Forrest v. Vasquez</u>, 75 F.3d 562,

9   563 (9th Cir.1996) (internal quotation marks and citation omitted), results in a procedural default thus

10  barring this Court from reaching the merits of this claim. <u>Whitley</u>, 505 U.S. at 338.  However, the Ninth

11  Circuit has stated that a denial under <u>Waltreus</u> "is neither a ruling of procedural default nor a ruling on

12  the merits," but rather "merely bars relitigation in state habeas proceedings of claims already litigated

13  on direct appeal." <u>Carter v. Giurbino</u>, 385 F.3d 1194, 1198 (9th Cir.2004).

14      Indeed, "a citation to <u>Waltreus</u> by a state court, standing alone, is neither a ruling on the merits,

15  nor a denial on procedural grounds, and, as such, has no bearing on a California Prisoner's ability to

16  raise a constitutional claim on Federal habeas review." <u>Medina v. Sandor</u>, 2012 WL 3689906, at * 4–6

17  (C.D.Cal. June 14, 2012) (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d

18  706 (1991)). In a situation such as this one, where Respondent asserts that a petition brought by a

19  California state prisoner is procedurally barred by a citation to <u>Waltreus</u>, a court must 'look through'

20  that citation to the last reasoned state court decision in order to determinate whether the citation to

21  <u>Waltreus</u> was based on an earlier procedural bar." <u>Id</u>. (citing <u>Ylst</u>, 501 U.S. at 805–806).

22      A state procedural bar that is both adequate and independent will be enforced by the federal

23  court on habeas review unless Petitioner shows cause and prejudice or a fundamental miscarriage of

24  justice.  Harris, 489 U.S. at 262; <u>Coleman</u>, 501 U.S. at 750.  In his Traverse, Petitioner has not

25  addressed either contention.  Accordingly, the claim as to juror no. 9 is barred in these proceedings.

26      As to juror no. 3, the state court denied the claim, stating that "petitioner has failed to show that

27  these issues are not barred because they were not raised in his appeal."  (LD 6)  In so ruling, the Court

28  cited <u>Walker</u>, which, in turn, relies upon <u>In re Dixon</u>, 41 Cal.2d 756, 759 (1953) for the proposition

that, in a habeas corpus proceeding, establish a procedural rule in California that a California court will

not review the merits of a claim if that claim *could have been raised* in a timely appeal but was not.

Walker, 10 Cal.3d at 773. Thus, under Dixon and its progeny (including Walker), the writ will not lie

where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment

of conviction"). See In re Harris, 5 Cal.4th 813, 823 (1993) (explaining In re Dixon rule).  Despite the

petitioner's failure to bring a claim on direct appeal from a conviction, a California court will hear the

merits of case if the court finds one of four exceptions. The four exceptions to the Dixon bar are: 1)

fundamental constitutional error; 2) a lack of fundamental jurisdiction by the trial court over the

petitioner; 3) the trial court's acting in excess of jurisdiction; and 4) an intervening change in the law.

Fields v. Calderon, 125 F.3d 757, 763 (9th Cir. 1997), *quoting* In re Harris, 5 Cal.4th at 828-842.

     Since the California Supreme Court's 1998 decision in In re Robbins, 18 Cal.4th 770, 811-812

& n. 32 (1998), the Dixon rule has been independent of federal law.  Park v. California, 202 F.3d 1146,

1152 (2000).  Since the California Supreme Court's 1993 decisions in In re Harris, 5 Cal.4th 813, 823

(1993) and In re Clark, 5 Cal.4th 750 (1993), the Dixon rule has been consistently applied, i.e.,

"adequate."  Park, 202 F.3d at 1152. Hence, any state court ruling procedurally barring a habeas claim

because the petition failed to raise that claim in his direct appeal, i.e., the Dixon rule, will be barred on

federal habeas review unless the petitioner can demonstrate (1) cause for the default and actual

prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of

justice.  Harris v. Reed, 489 U.S. 255, 262-263 (1989); Coleman v. Thompson, 501 U.S. 722, 750, 111

S.Ct. 2546 (1989).

     Here, Petitioner has not alleged, let alone established, entitlement to any exception to the Dixon

rule.  Accordingly, the claim is barred on federal review.

          3.  Analysis.

     However, even were the foregoing not the case, the claims would fail on their merits.  The

Court has already addressed the merits of Petitioner's claim as to juror no. 9 and will not repeat that

analysis here.  As to juror no. 3, the Court finds Petitioner's arguments unpersuasive.

          a.  Procedural History.

     During four days of Petitioner's trial, Petitioner was housed in a cell next to inmate Isaac

28

1   Vasquez, who, it so happened, had fathered a child by juror no. 3.  During the trial, juror no. 3 talked by

2   telephone with Vasquez, expressing to Vasquez, according to Petitioner, who allegedly overheard

3   Vasquez's side of the conversations, her concerns about sitting as a juror in Petitioner's case and

4   deciding Petitioner's fate.  After trial, Petitioner filed a motion for new trial based upon alleged juror

5   misconduct.

6          At the new trial hearing, Vasquez, responding to questions from defense counsel, testified that

7   juror no. 3 was his "baby's mother," and that she talked to him at the jail between April 2 and April 6

8   during Petitioner's trial.  (LD 28, p. 1898; 1901).  Vasquez testified that juror no. 3 told him she was

9   scared, that she did not know what she was doing, and wanted Vasquez's opinion as to what she should

10  do.  (LD 28, p. 1908).  Vasquez testified that he had once been a Norteno at one time, but now was no

11  longer affiliated with any street gang.  (Id., p. 1910).  He told juror no. 3 to just "go with the flow," and

12  to "do whatever."  (Id.).  He stated that if it were up to him, he would have found Petitioner guilty

13  because he was a member of a rival gang.  (Id.).

14         The trial court initially found that juror no. 3 had engaged in misconduct on two occasions: first

15  by withholding information during voir dire that she was affiliated with Vasquez, who had gang ties,

16  and second when she failed to disclose talking to Vasquez about the case.  (Id., p. 1928).  However, the

17  court concluded that Petitioner violated his obligation to notify counsel and the court of the purported

18  misconduct until after the jury had announced its verdict:

19         What affect [the misconduct] had on the jury, we don't know.  Even if there's a presumption
           that it did, that's trumped by the fact that he didn't disclose it at a time when something could
20         have been done about it.

21  (Id., p. 1928).

22         When defense counsel insisted that the verdict was announced before Petitioner could notify his

23  lawyer, the trial judge pointed out that the jury indicated they had reached a verdict on Monday, April

24  7, 2008, at 11:20 a.m., and that the verdict was announced in open court at 12:21 p.m..  (Id., p. 1929).

25  The judge indicated that Vasquez must have had his conversation with juror no. 3 between the close of

26  the court session on Thursday, April 3, at 3:28 p.m., and Monday morning.  The judge ruled that

27  Petitioner had "plenty of time" to notify his counsel or the court about the purported misconduct, and

28  that Petitioner is not permitted to "in essence sandbag and wait and see what the result is, and then after

1    he doesn't like the result then bring it up, and that's what has happened." (Id., p. 1927).  The court held

2    that such delay "trumped" juror no. 3's misconduct. (Id., p. 1928).

3         At a subsequent hearing, the judge attempted to clarify his earlier ruling in several significant

4    respects.  First, he indicated that he did not find that juror no. 3 engaged in two separate acts of

5    misconduct.  The judge explained that the failure to disclose a relationship with Vasquez during voir

6    dire could not be deemed misconduct because Vasquez indicated that, presently, he was not affiliated

7    with a gang and that, although old photographs of Vasquez wearing gang-related clothing were

8    introduced at the motion for new trial, because no evidence was presented as to when the photographs

9    were taken, no evidence showed that Vasquez was still a gang member.  Hence, juror no. 3's failure to

10   disclose a relationship with a gang member, i.e., Vasquez, during voir dire could was not proven.  (LD

11   29, p. 2001).

12        Next, the judge found the single act of misconduct in contacting Vasquez during deliberations

13   not to be prejudicial.  (Id.).  The judge noted that if juror no. 3 had actually been biased, she would not

14   have contacted Vasquez to share her doubts and concerns in the first place, i.e., she would have simply

15   voted to convict Petitioner.  (Id.).  Also, Vasquez did not tell her how to vote and only expressed his

16   own feeling, based on the fact that Petitioner was a member of a rival gang of his former gang. (Id.).

17   The judge further opined that this was not a case where a juror had received extra-judicial facts about

18   the case from a non-juror, since Vasquez testified that he did not know anything about Petitioner's case.

19   (Id., p. 2003).  Finally, the judge pointed out that no evidence was presented that any jurors were

20   affected by juror no. 3's misconduct and there was no evidence that the contact with Vasquez had any

21   impact on juror no. 3's own deliberations.  (Id.). The court concluded by again pointing to Petitioner's

22   failure to disclose the issue until after the verdict was announced, stating:

23        [T]he cases, in fact, require as part of a declaration and as part of the defendant's showing
          evidence that neither the defendant nor the defendant's counsel were aware of the misconduct.

24        …
          You're not allowed to gamble on the outcome while secretly preserving the error in the event of
25        an unfavorable verdict.

26   (Id., pp. 2004-2005).

27                            b.  Discussion.

28        Respondent first contends that the issue is procedurally barred by the trial court who considered

the claim waived by Petitioner's failure to raise it in a timely manner; the Court agrees.  California law requires that, with certain exceptions, appellate courts will not consider claims of error that could have been, but were not, raised in the trial court.  Peole v. Vera, 15 Cal.4th 269, 275 (1997).  That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).  Here, the trial judge's finding is that Petitioner waited until after the verdict to notify his attorney, thus precluding the tender a timely objection.  As mentioned previously, factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings.  Miller-El v. Cockrell, 537 U.S. at 340; § 2254(d)(2) and (e)(1).  Hence, the state court's determination that the claim has been procedurally defaulted bars federal review in this case.[5]

Although Respondent and the trial court list numerous reasons for finding no prejudice resulted from juror no. 3's misconduct, this Court is persuaded by three factors which would, if present, bear directly on the issue of prejudice: (1) Vasquez did not tell juror no. 3 how to vote or attempt to influence or coerce her into voting a particular way; (2) Vasquez did not communicate any extra-judicial facts that might have influenced juror no. 3; and (3) there is no evidence that either juror no. 3 was influenced in any way by Vasquez's comments or that she communicated these comments to any other members of the jury.  As mentioned previously, where misconduct occurs, the Court presumes prejudice and the government must show the contrary.  Here, the issue a close one, if the Court were deciding the issue de novo.  However, under the AEDPA, the Court must give deference to the state court's factual findings and its legal conclusions, unless those conclusions are objectively unreasonable.  For the reasons set forth above, and giving the state court all of the deference required by federal law, the Court cannot say that reasonable judicial minds could not disagree about whether juror no. 3's misconduct was prejudicial.  Accordingly, the Court must reject Petitioner's claim.

///

---

[5] In this regard, Respondent contends that no "clearly established federal law" exists as to whether a criminal defendant may or may not waive his right to an impartial jury.  (Doc. 17, p. 40).  Cases from various jurisdictions appear split on the issue; however, the Court has found no case directly on point that would constitute binding authority either way.

E.   Ineffective Assistance Of Trial Counsel.

Finally, Petitioner contends that the he was denied his Sixth Amendment right to the effective assistance of counsel in failing to move to discharge Jurors nos. 3, 4, and 9 for cause.  This contention too is without merit.

1.   The State Court Adjudication.

As Respondent correctly points out, Petitioner pursued his claims of ineffective assistance of counsel as to these three jurors in state habeas proceedings.  (LD 3; 5; 7).  The state court denied Petitioner's ineffectiveness claims as to jurors nos. 3 and 9, the 5th DCA rejected those claims as procedurally barred, citing Walker, because Petitioner could have raised, but did not, those claims in his direct appeal.  (LD 6).  The Court has previously discussed this state procedural bar and found it both independent and adequate.  Accordingly, Petitioner is barred from federal habeas review on those two issues.

Petitioner sought habeas corpus relief as to juror no. 4 in a petition in the California Supreme Court that was summarily denied, which is considered a decision on the merits.  (LD 8).  However, where the state court reaches a decision on the merits but, as here, provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002) (when there is an adjudication on the merits but no reason for the decision, the court must review the complete record to determine whether resolution of the case constitutes an unreasonable application of clearly established federal law); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, a petitioner still has the burden of

32

1   "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784.

2   Accordingly, the Court will conduct an independent review of Petitioner's claim as to juror no. 4.

3           2.   Federal Standard.

4         Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

5   Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of

6   counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428,

7   1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio,

8   488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the

9   assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the

10  implication is that Strickland does apply where counsel is present but ineffective).

11        To prevail, Petitioner must show two things. First, he must establish that counsel's deficient

12  performance fell below an objective standard of reasonableness under prevailing professional norms.

13  Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must

14  establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's

15  unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a

16  probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is

17  not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

18  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

19        With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

20  unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

21  Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

22  federal court believes the state court's determination under the Strickland standard "was incorrect but

23  whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

24  550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

25  AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

26  court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

27  Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state

28  court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

1    See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

2    unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

3    courts have in reaching outcomes in case-by-case determinations").

4                 3.   Analysis.

5          The Court has previously discussed in depth the lack of merit as to Petitioner's claims regarding

6    jurors no. 3 and 9.  Considering the Strickland standard's double deference, it seems readily apparent

7    that if Petitioner's claims as to these two jurors lack legal merit, then defense counsel cannot possibly

8    be ineffective for failing to raise meritless arguments in the state court.  Similarly, since the arguments

9    lack legal merit, it is difficult to see how Petitioner could possibly have been prejudiced by counsel's

10   failure to request that those two jurors be discharged from the venire.

11         As to juror no. 4, the record shows he was a correctional officer.  (LD 30, p. 113).  However,

12   that alone is insufficient to establish juror bias.  As the Supreme Court noted in Smith v. Phillips, 455

13   U.S. 209 (1982):

14           [D]ue process does not require a new trial every time a juror has been placed in a potentially
             compromising situation. Were that the rule, few trials would be constitutionally acceptable. The
15           safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge,
             are not infallible; it is virtually impossible to shield jurors from every contact or influence that
16           might theoretically affect their vote. Due process means a jury capable and willing to decide the
             case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial
17           occurrences and to determine the effect of such occurrences when they happen.

18   Smith, 455 U.S. at 217.  The Supreme Court has repeatedly rejected claims of implied bias based on

19   employment, noting that the accused was "free to show the existence of actual bias."  Dennis v. United

20   States, 339 U.S., 162, 167 (1950)(claim that jurors employed by the federal government were inherently

21   biased because such employees were subject to executive order providing for discharge of federal

22   employees upon reasonable belief in employee's disloyalty to government); Smith, 455 U.S. at 216-218

23   (rejecting claim of juror bias where juror, during course of trial, applied for employment as investigatory

24   with prosecutor's office). The Court thus concluded: "A holding of implied bias to disqualify jurors

25   because of their relationship with the Government is no longer permissible.... Preservation of the

26   opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury."  Dennis, 339

27   U.S. at 171-172. See also Frazier v. United States, 335 U.S. 497 (1948); United States v. Wood, 299

28   U.S. 123 (1936).

34

Accordingly, the mere fact that juror no. 4 was a correctional officer is insufficient to establish the actual bias necessary to support a challenge for cause.  Moreover, as Respondent correctly notes, juror no. 4 stated under oath that he could decide the case on the evidence, that he could be fair and impartial, and that he understood that law enforcement officers and detectives could make mistakes and wrong decisions.  (LD 30, pp. 116-117).  Under such circumstances, there was no legal basis to challenge juror no. 4 for cause.  Necessarily, then, defense counsel was not ineffective for failing to make such a challenge, and his failure to do so could not have been prejudicial to Petitioner's case.  Thus, on independent review, Petitioner has failed in meeting his burden to show "there was no reasonable basis for the state court to deny relief."  Harrington, 131 S.Ct. at 784.  Accordingly, the claim should be denied.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  **Within 21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed **within 10 days** (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __July 21, 2015__                              _____ **/s/ Jennifer L. Thurston**
                                                                           UNITED STATES MAGISTRATE JUDGE

35